<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| UNITED STATES OF AMERICA, | Crim. Action No. 18-617 (SDW) |
| Plaintiff, | **OPINION** |
| v. | April 30, 2020 |
| GREGORY WESTBERRY, | |
| Defendant. | |

**WIGENTON**, District Judge.

Before this Court is Defendant Gregory Westberry's ("Defendant") Motion to Suppress Evidence pursuant to Federal Rule of Criminal Procedure 12(b)(3)(C).  For the reasons discussed below, the Motion is **GRANTED**.

**I.**    <u>**FACTUAL AND PROCEDURAL BACKGROUND**</u>

Defendant is charged with violating 18 U.S.C. § 922(g)(1) by knowingly possessing a firearm after his conviction in the Superior Court of New Jersey, Essex County, of a crime punishable by imprisonment for a term exceeding one year.  (D.E. 1.)  On March 29, 2019, Defendant filed the instant motion to suppress evidence (namely, a firearm) seized during a search of his home on September 26, 2018, that was conducted without a search warrant but incident to an arrest warrant.  (D.E. 20.)  Defendant contends that the search exceeded the lawful bounds of the arrest warrant and violated his rights under the Fourth Amendment.  The United States of America (the "Government") opposed the motion on May 10, 2019, and Defendant replied on May 29, 2019.  (D.E. 23, 24.)  On July 31, 2019, this Court heard arguments from counsel and held an

evidentiary hearing on the suppression motion, including witness testimony.  (D.E. 29.)  At the conclusion of the hearing, this Court requested post-hearing briefing on the motion, which the parties submitted on January 7, 2020.  (D.E. 38, 39.)[1]

This Court, writing for the parties, assumes familiarity with the history of this matter and addresses only those facts relevant to deciding the present motion.  On August 9, 2018, the Honorable Renee Bumb, U.S.D.J. for the District of New Jersey, issued an arrest warrant for Defendant for violating the terms of his supervised release.  *See United States v. Westberry*, Crim. No. 11-355.  On the morning of September 26, 2018, members of the U.S Marshals Service's NY/NJ Regional Fugitive Task Force, led by Deputy U.S. Marshal Oscar Alvarez ("DUSM Alvarez"), executed the arrest warrant at Defendant's home in Irvington, New Jersey.  (D.E. 31 (Transcript of July 31, 2019 Evidentiary Hearing ("Tr.")) 151:7–25; 170:24–25.)

Prior to arresting Defendant, DUSM Alvarez spoke with Defendant's probation officer, Patrick Hattersley ("PO Hattersley").  (Tr. 107:25–108:1; 153:6–8.)  PO Hattersley told DUSM Alvarez about his communications with Defendant's wife, Mrs. Siobhan Westberry ("Mrs. Westberry").  Among other things, PO Hattersley relayed to DUSM Alvarez that Defendant had relapsed on drugs, that he was in possession of a firearm, and that Mrs. Westberry was concerned that Defendant "would be aggressive towards her" if he knew that she told PO Hattersley about his firearm.  (Tr. 108:2–8; 153:9–13.)  In addition, PO Hattersley testified that he told DUSM Alvarez that both Mrs. Westberry and her son lived with Defendant.  (Tr. 108:12–14.)[2]

---

[1] Although he is represented by counsel, Defendant (in his individual capacity) submitted a separate brief, (D.E. 40), that this Court will not consider as it "is not obligated to consider pro se motions by represented litigants."  *United States v. D'Amario*, 328 Fed. Appx. 763, 764 (3d. Cir. 2009).

[2] Mrs. Westberry's son was 17 years old at the time of the arrest and is mentally disabled, with the mental capacity of an eight-year-old.  (Tr. 54:8–11; 59:22–60:1; 61:18–21.)

According to Defendant and Mrs. Westberry, when DUSM Alvarez and his task force knocked on their door at approximately 7:00 A.M. on September 26, 2018, Defendant opened the door and said words to the effect of, "I'm who you're looking for." (Tr. 33:16–24; 60:13–16.) He thereby surrendered himself voluntarily at the front door of their second-floor apartment, where officers immediately arrested him, handcuffed him in his underwear, and sat him on the steps of the outside stairway. (Tr. 15:22–16:3; 60:16–17.) Five or six officers then entered the apartment with their guns drawn, secured Mrs. Westberry and her son in the living room, and began searching the apartment, going from room to room. (Tr. 60:21–62:7.) According to Mrs. Westberry, an officer pressured her to sign a consent-to-search form, but only *after* the firearm-in-question was found. (Tr. 62:8–64:7.)

Deputy U.S. Marshal William Uhler ("DUSM Uhler"), who was part of DUSM Alvarez's task force, corroborated Defendant's and Mrs. Westberry's testimony that the task force entered the Westberry home after Defendant had already surrendered himself at the front door. According to DUSM Uhler, when Defendant opened the door, DUSM Uhler immediately "push[ed] him back [outside the residence to] Deputy Alvarez, to handcuff him" and then the task force entered the residence. (Tr. 119:18–21.) Once Defendant was handed back, "[h]e was on the stairwell the whole time." (Tr. 134:5–136:15; 143:16–144:10.) After entering the residence, DUSM Uhler and others performed a "protective sweep" because they "noticed there were other family members in the house . . . . [and] believed there was a firearm in the house, and also [did not] know if the gentleman [they arrested] at the front door was [Defendant] or not." (Tr. 120:7–13.) DUSM Uhler additionally testified that at some point *after* Mrs. Westberry signed the consent form, DUSM Alvarez directed him to "get [Defendant] some clothes because he was in his underwear and to

start with the back room" of the apartment.  (Tr. 121:2–6.)  He testified that when he went to the back room, he saw and picked up a pile of clothes and the gun fell out.  (Tr. 121:9–12.)[3]

DUSM Alvarez's testimony both overlapped with and contradicted DUSM Uhler's testimony.  Like DUSM Uhler, DUSM Alvarez testified that the officers had not yet identified the person who answered the apartment door as Defendant when they entered the apartment.  (Tr. 155:21–156:2.)  However, in the pre-raid briefing, DUSM Alvarez had provided a photograph of Defendant and information about his height, weight, and criminal history.  (Tr. 154:16–25.)  On cross examination, DUSM Alvarez admitted that the black male who answered the door matched Defendant's photograph, height, and weight.  (Tr. 190:13–18; *see* Tr. 166: 2–11.)

However, unlike DUSM Uhler, Defendant, and Mrs. Westberry, DUSM Alvarez testified that the arrest occurred *inside* the residence.  According to DUSM Alvarez, the officers walked inside the residence when Defendant greeted them at the door.  (Tr. 156:4–10.)  He testified, "As soon as we entered the residence, I grabbed [Defendant] when we went in, placed him on the right-hand side and had him face the wall, handcuffed him, verified it was [Defendant], and notified him that he was under arrest."  (Tr. 196:1–4.)

DUSM Alvarez also testified that law enforcement obtained Mrs. Westberry's voluntary consent to the search prior to conducting the search of the apartment and that Defendant never objected to a search of his apartment.  (Tr. 162:1–163:17.)  However, Mrs. Westberry testified that, on the day of the search and on the day she was interrogated at the U.S. Attorney's Office, she complained to PO Hattersley about the way the arrest warrant was executed and, in particular,

---

[3] Upon having his memory refreshed on cross-examination, DUSM Uhler testified that the temperature on September 26, 2018 was in the high 70s and that it would not have made sense to dress Defendant in the insulated thermal overalls from which the firearm was alleged to have fallen.  (Tr. 146:8–147:4.)  Furthermore, the clothing that was actually given to Defendant to wear were his pajamas and slippers, which were located in his bedroom and not the back room. (D.E. 39 at 10.)

she said that the U.S. Marshals had seized the firearm at issue *before* asking for consent.  (Tr. 94:15–25; 95:12–22.)   Upon cross-examination, Mrs. Westberry repeatedly denied that the consent-to-search form was read to her, stating, "I was just told that I have to sign it . . . . It was just demanded that I put my signature on it."  (Tr. 81:1–10; 82:15–22; 87:25–88:1.)

At the evidentiary hearing, PO Hattersley stated that on the day of the arrest, Mrs. Westberry had only complained about the way the U.S. Marshals had treated her son, and did not tell him that the U.S. Marshals seized the firearm before asking her to sign a consent form.  (Tr. 105:9–106:23.)   However, in his September 26, 2018 "Chronos-Summary,"[4] USPO Hattersley wrote that Mrs. Westberry "expressed her disappointment about the way the Marshals handled the arrest of [Defendant] and handcuffing her son."  (D.E. 39-1.)  PO Hattersley also corroborated that Mrs. Westberry *did* complain that the U.S. Marshals seized the firearm prior to requesting her consent, when she spoke to him after being interviewed at the U.S. Attorney's Office on October 15, 2018.  (Tr. 110:5–25.)

Finally, DUSM Alvarez also admitted on cross-examination that he had every intention of searching for and recovering the firearm that had been reported to PO Hattersley, even *before* he knocked on Defendant's door, and even though he did not possess an arrest warrant and was trained to know that an arrest warrant is more limited in scope than a search warrant.  (Tr. 174:7–175:6.) DUSM Alvarez, after acknowledging that defense counsel had articulated the correct standard for when a law enforcement officer executing an arrest warrant is permitted to conduct a protective sweep, did not articulate any reason for why the marshals reasonably believed there was someone else in the residence who might pose a danger to the officers.  (Tr. 198:23–200:15.)

---

[4] According to PO Hattersley, the Chronos-Summary is a contemporary log that he kept of interactions with and events regarding offenders under his supervision.  (*See* Tr. 101:6–21.)

II.     **DISCUSSION**

### A.  Applicable Law

"[F]or Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which a suspect lives when there is reason to believe the suspect is within." *Payton v. New York*, 445 U.S. 573, 603 (1980); *see United States v. Agnew*, 407 F.3d 193, 196 (3d Cir. 2005).  Once the arrest warrant is executed, however, unless an exception applies, it no longer provides justification for law enforcement officers' entry into (or continued presence in) the home.  *See Maryland v. Buie*, 494 U.S. 325, 332–33 (1990).  Thus, if law enforcement officers execute an arrest warrant at the threshold of the home, they are no longer permitted to enter the suspect's home, much less search it.  *See Kyllo v. United States*, 533 U.S. 27, 37, 40 (2001).

In *Buie*, the Supreme Court outlined one such exception to this rule, known as the "protective sweep."  494 U.S. at 334.  The Court held that:

> [I]ncident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched. Beyond that, however, we hold that there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene.

*Id.*  Accordingly, "*Buie* 'prong 1' permits a warrantless search of a home 'incident to an arrest' occurring in the home, provided that the search is limited to those places 'immediately adjoining the place of arrest from which an attack could be immediately launched.'" *United States v. White*, 748 F.3d 507, 511 (3d Cir. 2014) (quoting *Buie*, 494 U.S. at 334).  However, where a protective sweep extends beyond the area immediately adjoining the place of arrest, "*Buie's* 'prong 2' authorizes a warrantless search of a home based on reasonable and articulable suspicion that the

areas being searched may 'harbor an individual' who poses a danger to those present at the scene of the arrest." *Id.* (some punctuation omitted) (quoting *Buie*, 494 U.S. at 334).

The *Buie* Court emphasized that this sweep must be "quick and limited," and "aimed at protecting the arresting officers, if justified by the circumstances." 494 U.S. at 327, 335. A protective sweep is "not a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found. The sweep lasts no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." *Id.* at 335–36.

### B.  Analysis

It is the Government's burden to prove that the warrantless search of a home falls within a recognized exception to the warrant requirement. *See United States v. Jeffers*, 342 U.S. 48, 51 (1951) (citations omitted). Here, the Government argues that the seized firearm was located during a lawful protective sweep of the home. (D.E. 38 at 12–17.) Defendant contends that the protective sweep violated the Fourth Amendment.[5] (D.E. 39 at 16–35.) This Court will analyze the parties' arguments according to the two-prong framework set forth by the Supreme Court in *Buie*.

According to all witnesses who testified at the evidentiary hearing, Defendant surrendered himself at the doorway to the Westberry home, and according to all witnesses other than DUSM Alvarez, Defendant was immediately passed back into the stairwell, handcuffed, and placed under arrest. (Tr. 15:22–16:3; 60:16–17; 119:18–21.) According to DUSM Alvarez, the arrest took place just inside the home, as soon as the officers entered the residence, after he pushed Defendant past the threshold and into the residence. (Tr. 196:1–6.) Under either scenario, the officers' right

---

[5] The Government also argues that Mrs. Westberry voluntarily consented to the search before it was conducted. (D.E. 38 at 18–21.) Defendant contends that Mrs. Westberry did not give prior consent to the search and any manifestation of consent was not an act of free will. (D.E. 39 at 36–44.)

to be present inside the Westberry residence expired long before they located the firearm and before they requested Mrs. Westberry's consent to search the home.

If Defendant was arrested in the stairwell, the arrest was fully executed without any invasion of the home and there was no longer any "reason to believe the suspect [was] within" the home. *Payton*, 445 U.S. at 603. Consequently, the U.S. Marshals no longer possessed authority to enter the home to effectuate an arrest that had already been accomplished outside the home. *See Agnew*, 407 F.3d at 196. To the extent that *Buie* prong 1 did authorize a protective sweep, it was to "look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched," 494 U.S. at 334, places that did *not* include the back room where the firearm was located. *Compare United States v. Rodriguez*, Crim. No. 18-662, 2019 WL 1895062 (D.N.J. Apr. 29, 2019) (Chesler, J.) (suppressing firearm found in bedroom by U.S. Marshals who entered and searched home after defendant surrendered at the front door) *with United States v. Latz*, 162 F. App'x 113, 116, 118–19 (3d Cir. 2005) (applying *Buie* prong 1 to deny motion to suppress where, while suspect was restrained on the front porch, an officer stepped just inside the doorway and looked to the left to make sure someone wasn't around the corner, and immediately observed two weapons in plain view). This is true even if DUSM Alvarez's testimony is credited and the arrest occurred immediately past the threshold and in the living room.

Because the officers extended their protective sweep beyond the area immediately adjoining where Defendant was arrested, this Court must analyze whether the officers' room-to-room protective sweep of the Westberry home was authorized under *Buie* prong 2, which requires "a reasonable belief, based on specific and articulable facts, that the area to be swept harbor[ed] an individual posing a danger to those on the arrest scene." 494 U.S. at 337.

The Government argues that it was objectively reasonable for the marshals to believe that the searched rooms harbored an individual posing a danger to them because, as DUSM Uhler testified, they (1) "noticed that there were other family members in the house . . . . [and knew from] the briefing there was a wife who was going to be in the house"; (2) "believed there was a firearm in the house"; and (3) did not "know if the gentleman at the front door was [Defendant] or not." (Tr. 120:7–13; D.E. 38 at 1–2.)  Furthermore, according to DUSM Alvarez, the mere possibility that someone else might be in the apartment—a possibility that exists in every case—warranted the protective sweep.  (Tr. 200:3–15.)

However, these arguments are not supported by the marshals' testimony and/or do not satisfy the standard set forth in *Buie*.  First, DUSM Uhler admitted during cross-examination that, based upon the pre-raid briefing by DUSM Alvarez, he knew that Defendant and Mrs. Westberry were in the home and that there was no information to support a reasonable belief that there was anyone else in the residence who might pose a threat to the officers.  (Tr. 140:11–22; 160:19–22.)[6] He also testified that the marshals considered Mrs. Westberry to be "cooperative" and a "victim," not a threat, which is why they permitted her to iron her clothes in preparation for work.  (*Id.*; Tr. 125:4–15; 140:19–24.)

Second, the mere presence of a firearm in the residence does not satisfy *Buie* prong 2, which allows sweeps for dangerous "individual[s]," not dangerous things.  494 U.S. at 337.  Nor did the firearm here create "exigent circumstances" that justified such a search.  *See Groh v. Ramirez*, 540 U.S. 551, 559 (2004) ("'[A]bsent exigent circumstances, a warrantless entry to search for weapons or contraband is unconstitutional even when a felony has been committed and

---

[6] Although PO Hattersley testified that he told DUSM Alvarez that both Mrs. Westberry and her son lived with Defendant, (Tr. 108:12–14), DUSM Uhler and DUSM Alvarez both testified that they were only informed that Mrs. Westberry lived with him.  (Tr. 140:11–18; 153:18–24.).  In either case, the officers possessed insufficient information to support a reasonable belief that there was anyone else in the residence who might pose a threat to them.

there is probable cause to believe that incriminating evidence will be found within.'" (quoting *Payton*, 445 U.S. at 587–88)); *Harris v. O'Hare*, 770 F.3d 224, 237 (2d Cir. 2014) ("We decline to extend the exigent circumstances exception to occasions in which the only claimed urgency is the alleged presence of a firearm."); *United States v. Johnson*, 22 F.3d 674, 680 (6th Cir. 1994) (holding that warrantless search and seizure of guns from defendant's closet was not justified because "[t]he mere presence of firearms d[id] not create exigent circumstances" once defendant's kidnap victim was freed and defendant was removed from the premises); *United States v. Gooch*, 6 F.3d 673, 679–80 (9th Cir. 1993) (holding that a "search was [] not justified by exigent circumstances, as . . . the defendant was in custody, handcuffed, and locked in the back of a patrol car" and because he "was not a danger to anyone, and he was the only one that the deputies had any reasonable grounds to believe had violated the law, or who could possibly have been a threat to them," and also holding that the "presence of a firearm alone is not an exigent circumstance").

Third, the marshals' testimony that they did not recognize Defendant at the front door or shortly thereafter is not supported by the factual record. DUSM Alvarez shared a photo of Defendant, along with his height and weight information, to the other marshals at the briefing he conducted the morning of the raid. (Tr. 154:16–21.) The marshals testified that the photograph and pedigree information matched Defendant's appearance and that they were not aware of anyone else living at the residence who matched that information. (*See* Tr. 166: 2–11; 190:13–18.) DUSM Alvarez additionally testified that as soon as he saw Defendant, he "took custody of him, placed him against the wall, placed him in handcuffs, and notified him that [they] were there to arrest *him*." (Tr. 156:8–10 (emphasis added); *see also* Tr. 196:1–4.) Thus, the factual record supports a finding that the officers identified, or reasonably should have identified, Defendant by the time they arrested him or shortly thereafter.

Similarly, DUSM Alvarez's testimony that the officers initiated the protective sweep based on the mere possibility that someone else might be in the apartment, (*see* Tr. 200:3–15), falls short of *Buie*'s requirement of "a reasonable belief, based on specific and articulable facts, that the area to be swept harbor[ed] an individual posing a danger to those on the arrest scene."  494 U.S. at 337; *see Rodriguez*, 2019 WL 1895062, at *4 ("That officers believed there *could have* been another individual in the home, who may have posed a danger, does not meet [the *Buie*] standard." (emphasis in original) (citations omitted)); *Sharrar v. Felsing*, 128 F.3d 810, 825 (3d Cir. 1997) (holding that "no information" about who remains inside a house "cannot be an articulable basis for a sweep that requires information to justify it in the first place" (some punctuation omitted) (quoting *United States v. Colbert*, 76 F.3d 773, 778 (6th Cir. 1996))), *abrogated on other grounds*, *Curley v. Klem*, 499 F.3d 199 (3d Cir. 2007).

It is instructive to compare the facts of this case with *United States v. Howard*, where the Third Circuit affirmed a district court's finding that the *Buie* standard was met where, *inter alia*, "Task Force members reported hearing a great deal of noise coming from upstairs, and at least one testified that he thought there were likely multiple people up there from the amount of noise heard." 729 F. App'x 181, 187 (3d Cir. 2018).  Similarly, in *United States v. Warren*, submitted by the Government as supplemental authority, (D.E. 41), the district court found "specific, articulable facts" to satisfy *Buie* where five minutes elapsed between the officers knocking and announcing themselves and the defendant answering the door, during which time the officers "heard movement within the trailer consistent with multiple people moving around."  Crim. No. 17-183, 2020 WL 134146, at *2 (W.D. Pa. Jan. 13, 2020) (record citation and internal quotation marks omitted). Here, in contrast, Defendant came to the door within seconds, there was no evidence that Defendant had any dangerous associates lurking in the home, there was no evidence that Mrs.

Westberry or her disabled son were a threat to the officers, and there was no evidence that the officers heard any noise or saw any movement that would support an inference that someone else was in the apartment who posed a threat to officer safety.  *See Rodriguez*, 2019 WL 1895062, at *6 (distinguishing from *Howard* and granting motion to suppress where officers articulated "[n]o such noises or comparable circumstances"); *United States v. Mark*, Crim. No. 09-20, 2009 WL 5286598, at *3 (D.V.I. Dec. 28, 2009) (granting motion to suppress where defendant came down to the door within seconds and there was no evidence that his girlfriend, whom the officers believed was also in the house, was a threat).

Based on the factual record and the testimony elicited at the evidentiary hearing, this Court concludes that the officers did not have a reasonable belief, based on specific and articulable facts, that a potentially dangerous individual was present in the Westberry residence after Defendant was arrested at or near the front entrance.  Indeed, this Court finds that the marshals' broad search of the Westberry residence was conducted specifically to find the firearm.  (*See* Tr. 174:7–175:6.) Because the firearm was discovered during an unlawful protective sweep, the Fourth Amendment requires that the evidence be suppressed.  *See United States v. Velasquez*, 626 F.2d 314, 318–19 (3d Cir. 1980).[7, 8]

---

[7] To the extent the Government argues that the firearm was lawfully discovered when the officers retrieved clothing for Defendant, this Court notes that there is no established "clothing exception" to the Fourth Amendment.  *See United States v. Jackson*, 414 F. Supp. 2d 495, 504 n.11 (D.N.J. 2006) (Wolfson, J.) (calling it a "dubious proposition that the [Supreme] Court contemplated the evanescent risks associated with transporting a barefoot or shirtless criminal suspect to police headquarters as exigent circumstances sufficient to dispense with the Fourth Amendment's warrant requirement" and noting that "typical examples of exigent circumstances recognized by the Third Circuit include, 'hot pursuit of a suspected felon, the possibility that evidence may be removed or destroyed, and danger to the lives of the officers or others.'" (quoting *United States v. Coles*, 437 F.3d 361, 366 (3d Cir. 2006))).  Moreover, even if clothing Defendant on a warm September day was necessary, the marshals could have asked Mrs. Westberry to retrieve the clothing, as DUSM Uhler testified that she was not a threat.  (*See* Tr. 125:2–15; 146:8–147:4.)

[8] The Government argues that Defendant's motion must be denied because Mrs. Westberry voluntarily consented to the search.  (D.E. 38 at 18–21.)  Even assuming, *arguendo*, that Mrs. Westberry's consent was voluntary, such consent was tainted by the officers' entry into the home and failure to leave once the arrest warrant was executed.  *See Kentucky v. King*, 563 U.S. 452, 463 (2011) (holding that "officers may seek consent-based encounters *if they are lawfully present in the place where the consensual encounter occurs*" (emphasis added) (citation omitted)).  "To determine whether consent purged the taint of the illegality for Fourth Amendment purposes, courts consider a number of factors

III.   <u>**CONCLUSION**</u>

For the reasons set forth above, Defendants' Motion to Suppress is **GRANTED**.   An appropriate order follows.

s/ *Susan D. Wigenton*_____
**SUSAN D. WIGENTON**
**UNITED STATES DISTRICT JUDGE**

Orig:          Clerk
cc:            Parties

---

including: (1) the temporal proximity between the consent to search and the Fourth Amendment violation; (2) the existence of intervening circumstances; and (3) the purpose and flagrancy of the officer's misconduct." *United States v. Johnson*, Crim. No. 12-291, 2012 WL 5354601, at *7 (E.D. Pa. Oct. 31, 2012) (citing *Brown v. Illinois,* 422 U.S. 590, 603–04 (1975)) (other citation omitted).  Here, as in *Johnson*, the written consent was obtained while the officers were illegally in the home and "only shortly after law enforcement violated the Fourth Amendment when they entered the apartment without a warrant.  The Government can point to no intervening circumstances that would have purged the taint of the illegal entry."  *Id.* at *8.  Furthermore, based on the record, this Court concludes that the officers presented Mrs. Westberry with the written consent form in an attempt to erase a warrantless entry into the residence. *See id.*  Because Mrs. Westberry's consent was not lawfully obtained, the seized firearm "remains tainted as the fruit of the poisonous tree and must be excluded."  *Id.* (citing *Wong Sun v. United States*, 371 U.S. 471, 485–86 (1963)).